MASTER HATCHERIES, INC. v. J. HOWARD COBLE, NORTH CAROLINA COMMISSIONER OF REVENUE

No. 83

(Filed 12 March 1975)

Taxation § 31— use tax — commercial hatchery — manufacturing industry
    A commercial chicken hatchery is a manufacturing industry or plant within the meaning of G.S. 105-164.4(1)(h) ; therefore, machinery purchased for use in the hatchery is subject to a use tax of only 1% rather than the regular rate of 3%.

    Justice LAKE dissenting.

    Justice BRANCH joins in dissenting opinion of Justice LAKE.

    Justice HUSKINS dissenting.

APPEAL by defendant under G.S. 7A-30(2) from the decision of the Court of Appeals reversing the judgment of *Hall, J.,* 20 August 1973 Civil Session of CHATHAM Superior Court, docketed and argued as Case No. 19 at Fall Term 1974.

Plaintiff-taxpayer sues under G.S. 105-267 to recover from the Commissioner (now Secretary) of Revenue sales and use taxes paid under protest. The facts are stipulated.

Plaintiff operates a commercial hatchery, in which approximately 362,000 eggs are incubated and 300,000 baby chicks

are hatched each week. Plaintiff purchases "hatching eggs" in cases containing twenty-four dozen eggs each. The eggs are removed from the cases to an egg-traying table, where they are cleaned and oversized or undersized eggs are removed. A vacuum lift then picks up forty-eight eggs at a time and places them in an incubation tray holding 144 eggs. Each tray is placed in a buggy which transfers thirty trays at a time from the grading-cleaning-traying room into the incubator room. There the trays are removed from the buggy and placed on racks in the incubator, where the temperature is maintained at 99° and the humidity at 87%.

The eggs remain in the incubator for eighteen days, during which time they are mechanically turned every hour so as to change the position of the embryo. On the fifteenth day the lower trays are moved to the top racks and the higher trays to the bottom racks. On the eighteenth day the trays are removed from the incubator, placed in buggies, and rolled into the hatching room. The eggs are then transferred by hand to larger hatching trays, and the incubator trays are taken to a washing machine where they are cleaned and disinfected for a new cycle. The hatching trays are placed in a "hatching machine," where the eggs remain in one position for three days at a temperature of 98° and a humidity of 90%.

On the twenty-first day the baby chicks emerge from the shell and are taken, still in the hatching trays, to a grading room. There the chicks are placed on a conveyor belt which carries them past employees who vaccinate and debeak them. The chicks are then placed in boxes, one hundred to a box, and shipped. The hatching trays are cleaned and disinfected for the next cycle. Eggs which did not hatch are dumped on the county landfill.

Hatching cycles are started twice each week. Each cycle "must be accompanied by continuous vigilance as to temperature and humidity and by constant cleaning and disinfecting of trays, hatchers, incubators, floors and walls."

In 1972 plaintiff purchased certain machinery for use in its hatchery business. As it had done prior to 28 December 1972, plaintiff paid use tax on this machinery at the rate of 1% of the sales price, subject to a maximum tax of $80.00 per article. This is the rate imposed upon the sale or use "of mill machinery or mill machinery parts and accessories to manufacturing indus-

---

---

tries and plants." G.S. 105-164.4(1) (h) and G.S. 105-164.6(1).
The Commissioner of Revenue, contending that plaintiff was
not a manufacturing industry or plant within the meaning of
G.S. 105-164.4(1) (h), computed the use tax at the regular rate
of 3% which G.S. 105-164.6(1) imposes upon the cost price
of each item of tangible personal property not entitled to the
lower rate under G.S. 105-164.6(1). He then assessed plaintiff
with the unpaid balance he claimed to be due.

On 28 December 1972, under protest, plaintiff paid the
amount in controversy, $5,864.60, and demanded its return.
Upon the Commissioner's failure to refund the money, plaintiff
instituted this action. The matter came on to be heard before
Judge Hall, who entered judgment that "the plaintiff is not en-
titled to the lesser rate of tax provided by G.S. 105-164.4(1) (h)
and G.S. 105-164.6(1) on its purchases of machinery and equip-
ment for use in the operation of its commercial hatchery." Upon
appeal, the Court of Appeals reversed and ordered that the addi-
tional use tax of $5,864.60 assessed against plaintiff be refunded.
*Hatcheries v. Coble,* 21 N.C. App. 256, 204 S.E. 2d 395 (1974).
One member of the panel having dissented, the Secretary of
Revenue appealed to this Court as a matter of right.

*Ray F. Swain for plaintiff appellee.*

*Robert Morgan, Attorney General; Myron C. Banks, Assist-
ant Attorney General; and Norman L. Sloan, Assistant Attor-
ney General, for defendant appellant.*

SHARP, Chief Justice.

The parties stipulate that the question presented is whether
plaintiff, a commercial hatchery, is a manufacturing industry
or plant *within the meaning of G.S. 105-164.4(1)(h).*

It is everywhere conceded that the term *manufacturing* as
used in tax statutes is not susceptible of an exact and all-
embracing definition, for it has many applications and mean-
ings. Where, as here, the statute does not define the term, courts
have resorted to the dictionaries to ascertain its generally ac-
cepted meaning and have then undertaken to determine its
application to the circumstances of the particular case. There
are many holdings and statements to the effect that to consti-
tute manufacturing, the operation, process, or activity in ques-
tion must produce a new and different commodity or work a

substantial change in the basic material. *See* Annot., 17 A.L.R. 3d 7, 23, 27 (1968); *Duke Power Co. v. Clayton, Comr. of Revenue,* 274 N.C. 505, 164 S.E. 2d 289 (1968); *Bleacheries Co. v. Johnson, Comr. of Revenue,* 266 N.C. 692, 147 S.E. 2d 177 (1966); *State v. Chadbourn,* 80 N.C. 479 (1879); 55 C.J.S., *Manufacturers* § 1 (1), (2) (1948).

While the use of sophisticated automated equipment is not determinative of whether a particular operation is manufacturing, many courts have used the fact that such machinery was involved to support their conclusion that the production constituted manufacturing. Annot., 17 A.L.R. 3d 7, 33-34 (1968). *See Hearst Corp. (News Amer. Div.) v. State Dept. of A. & T.,* 269 Md. 625, 639-640, 308 A. 2d 679, 687-688 (1973).

Plaintiff contends that, by means of complicated, precision equipment, it incubates eggs from which are hatched 300,000 chicks a week—production on a scale which could not otherwise be obtained; that by the application of skill and labor to raw material (eggs), a new and more valuable property (chicks) is produced; that the fact plaintiff has duplicated a natural process is immaterial; that this operation constitutes manufacturing within the meaning of the applicable taxing statute as defined by this Court in *Duke Power Co. v. Clayton, Comr. of Revenue, supra.*

Defendant argues that "since 'only God can make a tree' . . . only God can make a baby chick"; that "manufacturing can never occur when the end product is a living organism"; that "the hatchery does not by its skill and labor convert the eggs into baby chicks, because the eggs convert themselves."

Certainly a commercial hatchery could never produce a chick without the fertilized egg which only a hen and rooster can create. Yet it is equally true that, left alone, an egg could never convert itself into a living organism; it would merely become the odious rotten egg. It is also true that when the setting hen comes off the nest with her small brood, we do not say she has manufactured her chicks. However, her uncomplicated operation in the undisinfected hen house is a far cry from the mass production which the commercial hatchery achieves by the use of modern technology.

Only three decisions on the question here presented have come to our attention. Two support defendant's contentions: *Perdue, Inc. v. State Dept. of Assessment & Taxation,* 264 Md.

228, 286 A. 2d 165 (1972) ; *Peterson Produce Co. v. Cheney,* 237 Ark. 600, 374 S.W. 2d 809 (1964). As did the Court of Appeals, however, we find convincing the rationale of the third case, *Miller v. Peck,* 158 Ohio St. 17, 106 N.E. 2d 776 (1952).

In *Miller v. Peck, supra,* the Supreme Court of Ohio held that the mechanical equipment utilized by a commercial hatchery was used in manufacturing within the meaning of its tax statute which reduced the assessed valuation on "all engines, machinery, tools and implements of a manufacturer." That court adopted the Century Dictionary's definition of *manufacturing,* "the production of articles for use from raw or prepared materials by giving to these materials new forms, qualities, properties or combinations, whether by hand labor or by machinery." It then inquired, "Does the fact that the process had to do with the mechanical stimulation and development of an animal germ to a living animal itself as the end product for immediate sale in the channels of commerce take the operation out of the category of manufacturing?"

In answering the question NO the court noted: (1) "Usually, where, through the use of tools and machinery commodities or items of personal property are by special treatment or processing transformed into other more valuable items of personal property as a commercial business, the operation is that of manufacturing." (2) In certain "clearly manufacturing processes" living organisms are used to make new products such as commercial yeast, beer, bread. (To this list we add commercial vaccines.) (3) "The reason for the partial exemption from taxation of tools and machinery used in . . . manufacturing is to encourage such use since it results in the production of more valuable personal property which in turn becomes subject to taxation." (4) The machinery and equipment of a commercial hatchery are "within the spirit and purpose of the statute" and are therefore entitled to the partial exemption it provides.

In view of the adequate opinion of the Court of Appeals we deem further discussion of the parties' contentions unnecessary. We hold that plaintiff, a commercial hatchery, is a manufacturing industry within the meaning of G.S. 105-164.4(1) (h). The decision of the Court of Appeals is

Affirmed.

Justice LAKE dissenting.

It is not the function of this Court to establish tax policies for the State so as to promote desirable segments of the economy, or so as to do economic or social justice among groups of taxpayers. Those are functions of the Legislature. Our authority is limited to construing the Revenue Act as written by the Legislature and, when the question is properly raised, to determine the constitutional validity of a provision thereof. Thus, we are not here concerned with whether it is economically wise, or just, to tax sales of equipment to commercial hatcheries at the same rate as sales of groceries to the housewife, while taxing at a much lower rate sales of mill machinery to textile plants or furniture factories.

The cardinal principle of statuory construction is, of course, that the words of the statute must be construed so as to carry out the intention of the Legislature. *Sellers v. Refrigerators, Inc.,* 283 N.C. 79, 194 S.E. 2d 817; *Person v. Garrett,* 280 N.C. 163, 184 S.E. 2d 873; *Pipeline Co. v. Clayton,* 275 N.C. 215, 166 S.E. 2d 679; *In re Watson,* 273 N.C. 629, 161 S.E. 3d 1, 35 A.L.R. 2d 1114. Subordinate principles are that, in order to determine the legislative intent, in the absence of a clear indication to the contrary, words in a statute must be given the meaning they have in ordinary usage, *Power Co. v. Clayton,* 274 N.C. 505, 164 S.E. 2d 289, and *Bleacheries, Inc. v. Johnson,* 266 N.C. 692, 147 S.E. 2d 177, 17 A.L.R. 3d 1, and provisions in a taxing statute granting an exemption or a lower tax rate are to be strictly construed against the claimant of such exemption or special privilege. *In re Clayton-Marcus Co., Inc.,* 286 N.C. 215, 210 S.E. 2d 199; *Good Will Distributors v. Shaw, Comr. of Revenue,* 247 N.C. 157, 100 S.E. 2d 334; *Henderson v. Gill, Comr. of Revenue,* 229 N.C. 313, 49 S.E. 2d 754.

In ordinary speech one does not talk of manufacturing eggs and chickens but of producing, hatching and raising them. "Mill machinery" and "accessories to manufacturing industries and plants" are terms which do not readily come to mind as one contemplates a farmer buying materials with which to make nesting boxes for his hens or feeding pens for his baby chicks. The inapplicability of those terms to that activity is no less when the farmer has hundreds of hens instead of half a dozen. The process of chicken production is not generically different when the farmer becomes a corporation and the carefully regulated temperature of an electrically powered incubator and the turn-

Hatcheries, Inc. v. Coble

ing of the eggs by a mechanical device are substituted for the warm body and stirring feet of the loving, though irascible, natural mother. "Mill machinery" and "manufacturing industries" simply do not suggest the production of baby chicks. If the special tax rate should be extended to those engaged in this activity, it is a simple matter for the Legislature, now in session, to do so.

Justice BRANCH joins in this dissenting opinion.

Justice HUSKINS dissenting.

I respectfully dissent from the majority view that a commercial chicken hatchery "manufactures" the baby chicks which are hatched in its place of business. If the hen that lays and hatches her eggs is not in the "manufacturing" business, certainly a commercial hatchery doesn't qualify for the title. I would interpret G.S. 105-164(1)(h) and G.S. 105-164.6(1) accordingly and leave it to the General Assembly to include commercial hatcheries among the industries entitled to the one percent use tax rate on machinery purchased for use in such business.

As a matter of equal treatment, commercial hatcheries are entitled to the favorable one percent tax rate the same as manufacturing and industrial plants which use mill machinery or mill machinery parts and accessories. But there is a limit to interpretative reaching and stretching for the sake of uniformity beyond which courts should not go. Such is the case here. Every layman of normal intelligence knows that a hatchery does not "manufacture" baby chicks, and the law does not require judges to be more ignorant than other people. I therefore vote to reverse the Court of Appeals and reinstate the judgment of the trial court that the hatchery operated by plaintiff is not a manufacturing industry or plant within the meaning of the tax statutes involved.